# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL INSPECTION & REPAIRS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.    03 C 5529 |
| | ) | Judge Blanche M. Manning |
| GEORGE S. MAY INTERNATIONAL COMPANY and WILLIAM DOANE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

In this case, the plaintiff, National Inspection & Repairs, Inc. ("NIR"), hired the defendant, George S. May International Company ("May"), to perform a short-term management consulting engagement to develop accounting and inventory controls at NIR.  At some point right before or right after the end of the three-week consulting engagement, NIR hired one of the May consultants, co-defendant William Doane, as its controller despite a clause in their agreement stating that NIR could not hire any May employees for at least one year from the date of the agreement.  Unbeknownst to both NIR and May, the consultant had earlier pled guilty to a charge of stealing from another company, and soon after arriving at NIR, he embezzled money from NIR.  According to NIR, Doane's wrongdoing led to the company's demise and cost it $18 million in lost profits.  NIR believes May is responsible for its loss and alleges against May several state law claims under this court's diversity jurisdiction.  May has brought a motion for summary judgment on all of the claims, including its counterclaim for breach of contract.  For the reasons stated below, the motion is granted.

# I.    Parties' Submissions

The court notes at the outset that certain challenges arose during its consideration of May's motion for summary judgment based on deficiencies in the parties' briefing.  First, NIR tends to make arguments without proper legal or evidentiary support; as a result, the court has concluded that certain of its arguments have been waived.  *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 862 (7th Cir. 2005)("[U]nsupported and undeveloped arguments are waived.").  At other points, when NIR has provided some authority for the court to consider, the court has limited itself to the arguments as *expressly framed* by NIR as it is not this court's job to make arguments or marshal evidence for represented parties.  *Obriecht v. Raemisch*, 517 F.3d 489, 4920-93 (7th Cir. 2008) ("conclusory arguments" in summary judgment filings presented to the district court were insufficient, so the district court did not err when it limited its consideration to the arguments and record properly before it).

In addition, NIR's submission repeatedly fails to provide pinpoint cites, forcing the court to sift through the cited case in an effort to ascertain where the quote or relevant discussion is located.  Moreover, in its response to the plaintiff's statement of fact, NIR fails to reproduce the paragraph to which it is responding in violation of this court's case management procedures.  Further, without prior leave of court, NIR filed 69 additional facts in violation of LR 56.1(b)(3)(C), which states that "[a]bsent prior leave of Court, a respondent to a summary judgment motion shall not file more than 40 separately-numbered statements of additional facts."  Despite NIR's untimely request to file more than 40 paragraphs (NIR filed its request only after May's reply alerted NIR to the problem), in the interests of completeness, the court grants NIR's motion for leave to file in excess of 40 additional facts and denies May's motion to strike the

additional facts as moot.

May also moved to strike certain statements of fact on the ground that NIR's responses were improper. The court agrees that certain of NIR's responses or additional facts improperly state legal conclusions, assert facts not supported by the record, or misstate the evidence, and has attempted to address these improprieties in the context of its order. For example, in the statement of facts, the court simply has not incorporated asserted statements of fact that are not supported by the record citation. Thus, May's motion to strike certain responses by NIR or certain statements of additional fact is granted in part as discussed in the order. Otherwise, the motion to strike is denied.

As to May, its record citations also do not always support the statement of fact for which they are cited. The court elaborates on this deficiency later in its memorandum opinion and order as relevant.

Finally, the court notes that it had to request tabbed exhibits and an exhibit index from May and an exhibit index from NIR.

While all of the deficiencies discussed above may not individually hamper this court's timely and efficient consideration of the motion, taken altogether, these inadequacies make this court's job much more difficult than need be. In the future, the court will not accept such filings and will require the parties to resubmit them in proper form. Nevertheless, in the interest of judicial efficiency and to prevent the parties from incurring additional costs, the court has considered the motion, the supporting papers, and the parties' arguments in their present form.

## II.    Facts

*Background*

Defendant May has its principal place of business in Park Ridge, Illinois, and provides a wide range of business consulting services to its clients. NIR was a Kansas corporation with its principal place of business in Topeka, Kansas. It inspected heavy equipment and machinery owned by its customers to ensure, among other things, that these companies were in compliance with OSHA guidelines. NIR stopped conducting business in approximately 2003 or 2004. As of May 1999, NIR had approximately 40 employees.

*May's Consulting Engagement at NIR*

David Price was NIR's president. In early May 1999, Wayne Dille, a May Survey Analyst, met with David Price at NIR. May Survey Analysts are the first May employees to meet with the client for the purpose of gathering information about the client's issues and offering various consulting solutions provided by May. On May 4, 1999, NIR authorized May to perform certain consulting services pursuant to a document entitled "Authorization for Service and Method of Payment," referred to herein as the Agreement. Per the Agreement, May was to begin performing services for NIR on May 5, 1999.

The Agreement provides that May will, "by discussions, recommendations and progress reports, keep the client informed as to its progress." It further provides that:

> In order that there may be continual meeting of the minds between the client and [May] and, particularly, in order that the continuation of the services of [May] is at all times within the client's control, acceptance or rejection of all, or any part, of matters covered in discussions, recommendations and progress reports shall be by client's signature to Progress Reports of [May] under "Examined, Accepted and Approved," specifically excluding by designation any statement not approved.

In addition, the Agreement states that:

> Achievements realized from Management Service work depend upon many factors, including human aptitudes and cooperation of the client's staff, which

factors are not within the control of [May].  Therefore, it is understood and agreed that no express or implied warranty of any general or specific results shall apply to the work done under the agreement.

The Agreement further specifies that all staff members, without exception, are under contract with May and are bonded to the extent of $500,000 for the protection of clients. Moreover, the Agreement states that "[r]ecognizing that all Staff Members of the Company are contractually restricted from working for clients of the Company for a period of one year after leaving the Company's employ, the client agrees not to employ or engage the services, directly or indirectly, of any person now employed by the Company, for a period of one year from date of Survey Authorization."  In addition, the Agreement contains a provision stating that "[i]t is expressly agreed that this printed document embodies the entire agreement of the parties in relation to the subject matter of Management Service to be rendered by [May], and that no understandings or agreement, verbal or otherwise, in relation thereto, exist between the parties except as herein expressly set forth."  Finally, the Agreement states that the "client will provide suitable working space for the Staff due to the confidential character of the work."

An analysis was done by May which preliminarily identified NIR's problems.  The project director for the May consulting project, Vladimir Tigay, received a copy of the Report the night before the engagement started.[1]  Tigay was employed by May from 1996 until June 1999.

---

[1]The court notes here that the facts stated by May are often not supported by the citation to the record provided.  For example, May's statement of fact paragraph 25 states that "[a]t the end of the meeting, the Survey Analyst prepares a report entitled Survey's Instruction to Management Service (the "Report") that identifies the client's preliminary problems."  Paragraph 25 then cites to Exhibit J.  But Exhibit J is simply a copy of the report–it does not provide any support for the proposition that the report is prepared at the end of "the" (unidentified) meeting, that a survey analyst prepares the report or what the report supposedly identifies. The court has attempted to limit the statements of fact to what is supported by the record.  May's overstatement of what the record reflects, however, has added to the court's time in considering the motion.

Although not specifically in the context of the NIR engagement, Tigay testified that after reviewing the initial report, the project director would generally meet with the client for the first time and conduct an opening conference in which the project director would go over the terms of the Agreement and ask questions to better understand the client's problems. The project director would then create a recommended program for the client. May provided the general guidelines for creating the different programs to its project directors. However, the programs developed for each client were also informed by the project director's personal observation and interactions with the client. Tigay further testified that after the opening conference, he would be in telephone contact with the staff executives on a project but might never return to the project site if there were no problems.

Further, Tigay generally stated to clients:

> During the project, we will make many inquiries about your internal documents that otherwise you might consider confidential and vitally important for business and I understand your concerns about confidentiality with these documents. I want to assure you that these professionals will not abuse your trust; they will work with these documents for your benefit. And for your protection, for the comfort of yours, this company, George S. May Company, that all of us who present [sic], bond each and every one of us for $500,000 in case we present any harm to you.

Tigay recommended two programs for May: Managerial Control Accounting (MCAP) and Profit and Expense Control (PECP). The MCAP relates to managing direct costs as opposed to controlling expenses. The PECP focused on discussing the profitability of the company, its expense controls and building and controlling budgets. These programs, which Tigay developed specifically for NIR, were examined, accepted and approved by David Price on May 7, 1999. The documents provided by May to NIR for each of the projects states that: "The above project is

to be completely installed and personnel indoctrinated in its use." It then states:

> The above program is the entire program agreed upon for development at this time and this document represents the total description of the project as referred to in the Authorization for Management and Methods of Payment (Form #56), Paragraph Two, between National Inspection and Repair, [sic] Co and George S. May International Company.

> In addition, but not as a specified part of the program, our consulting staff will offer suggestions or recommendations, should the occasion occur, for and/or about areas for improvement or corrections not covered by this program. These findings will not be implemented or developed, however, without full approval of our client and only as a separate identity from the program.

Project 2.3 in the MCAP document stated: "Identify critical process points and establish mechanisms for control over accuracy of the process." Project 2.8 in the MCAP document stated: "Assist in interviewing candidates for the position of NIR controller" with the objective of "help[ing] the client choose an appropriate employee." On May 3, 1999, Price, NIR's president, wrote to May that one of his objectives was to "[f]ind a good in-house account [sic]" and further stated that "[t]his is the utmost priority."

The May Field Service Manual states:

> NOT JUST "RECOMMENDATIONS" BUT ACTIONS AND RESULTS. Under this principle, [May] is prepared to install what it claims should be done to aid a business. After a company has been thoroughly analyzed and its problems identified, a program is designed to address those problems. [May] Consultants carry out this program to the last detail. . . . The consulting staff teaches and trains the client and key staff people all the new systems and controls. . . ."

May assigned two staff executives to the NIR project: Fred Metzger and William Doane.[2] Staff executives report directly to the Project Director who supervises their work and is ultimately responsible for the success or failure of the project. Tigay would provide the staff

---

[2]Fred Metzger is not further referenced by either of the parties.

executives with a plan of action and discuss it with them. He would then remain at the client's office until he believed that the client was comfortable with the staff executives and vice versa. Doane was the only May employee at NIR for 21 days of the 25-day consulting engagement.

Over the course of the work performed by May, May submitted a total of five Progress Reports to NIR, as required by the Agreement. The Progress Reports provided May with a formal method of communicating the project status and critical points of the project to the client and to May headquarters. Tigay stated in his deposition that the progress reports were a way to "capture the level of client satisfaction" to determine if any problems existed which could then be addressed as soon as possible.

If the project director was not working on site, it was the staff executive's responsibility to complete the progress reports and review them with the client. May provided Progress Report One ("PR1") to NIR on May 7, 1999, covering the period May 5, 1999 through May 7, 1999. PR1 discusses the initial meetings between May and NIR and notes that the two programs recommended by May, MCAP and PECP, were approved by NIR on May 7, 1999. PR1 indicates that it was "Examined, Accepted and Approved" by David Price on May 7, 1999. PR1 also includes a statement that "[d]uring the first days of the project, we got acquainted with the company's operations, designed organizational structures, initiated distribution of responsibilities, [and] analyzed your financial information and office organization." In addition, PR1 includes a handwritten note on the report which states, "Analyst garanteed [sic] company's profitability of 18.6% as the result of using tools developed through the project. Quantified savings expressed in our recommendations will be at least 2:1 to fees paid."

May provided NIR with Progress Report Two ("PR2") on May 14, 1999. While May

contends that PR2 accurately states the work that May, through Doane, performed during that period, NIR disputes this.  PR2 indicates that it was "Examined, Accepted and Approved" by David Price on May 14, 1999.  Progress Report Three ("PR3") was provided to NIR on May 21, 1999.  As with PR2, while May contends that PR3 accurately states the work that May, through Doane, performed during that period, NIR disputes this.  PR3 indicates that it was "Examined, Accepted and Approved" by David Price on May 21, 1999.

May provided Progress Report Four ("PR4") to NIR on May 28, 1999 and covered the period of May 21, 1999 through May 28, 1999.  As with the PR2 and PR3, while May contends that PR4 accurately states the work that May, through Doane, performed during that period, NIR disputes this.  PR4 indicates that it was "Examined, Accepted and Approved" by David Price on May 28, 1999.  May provided Progress Report Five ("PR5") to NIR on June 2, 1999.

PR5 summarizes the action items from the MCAP and PCEP programs.  It states that "[y]ou have stated that you are satisfied with the work completed and the final project results," and it is signed by David Price for NIR.  The second page of the report indicates that it was "Examined, Accepted and Approved" by David Price on June 2, 1999.

While Doane testified he was responsible for hiring NIR's new controller pursuant to Project 2.8, David Price and Ken Burkhead, another NIR employee, also sat in on several of the interviews.  Doane testified that Price untimately asked him to work as NIR's controller.[3]  Price

---

[3]NIR asserts in its additional statement of fact number 50 that Doane "committed numerous frauds" while at NIR including a "pretend" job search for a controller, even though Doane's daily work reports do not reflect such a search.  However, NIR's own citation is the deposition of David Price stating that Doane did conduct such a search and that Doane had interviewed "nine or ten people" for the controller position.  Price December 2005 Dep. Tr. at 137, NIR's Exh. EE.

testified that Doane also interviewed and hired people for the position of bookkeeper and secretary. However, Doane testified that while he may have recommended people, Price hired everyone.

On June 2, 1999, David Price, as president of NIR, sent a letter to May stating that:

> This letter is to inform you that the consulting work performed by your firm has been to my satisfaction. I am satisfied with the work. My employees are trained in the concepts established by your consultants and they are beginning to implement them. I believe that the various recommendations presented regarding savings for my company are realistic and several have been satisfied.

The final May invoice to NIR was for $110,000.

*Doane's Employment with May*

Doane was employed as a staff executive at May from May 5, 1998 until his termination. In his application for employment with May on October 11, 1998, in response to the question, "Have you ever been convicted of a felony or crime involving theft or dishonesty?," Doane answered "no." In October 1988, in his Fidelity Bond Application, Doane was asked whether he had been convicted of "any crime, felony or misdemeanor other than a traffic violation?," which he answered "no." May did not conduct a background check on Doane prior to hiring him. In Doane's application for employment with May, the prior employment verification sections are blank. However, Doane identified Comprehensive Accounting Service as his "former employer" in his May employment application noting that he was the "owner/franchisee" from 1977 to 1998 and had sold the business.

May contends that through his bond application, Doane was covered by May's Commercial Crime Policy through CNA. Specifically, at the time of May's consulting engagement with NIR, it contends that it had insurance coverage for employee dishonesty in an

amount up to $500,000.[4]

NIR asserts that Doane was not covered because May did not fill out the portion of the application it was supposed to, May has provided no evidence that it sent the bond application to its insurer, and the policy states that the coverage is void if an insured misrepresents a material fact. NIR argues that because Doane misrepresented that he had not been convicted of a crime, any coverage is void. Again, however, NIR fails to point to any affidavits or deposition testimony by any insurance company representative, expert, or knowledgeable lay person which supports this conclusion. In addition, May disputes this last statement of fact, citing to the insurance policy, which provides that:

> We will not pay for loss as specified below:
>
> 1.    Acts Committed by You or Your Partners: Loss resulting from any dishonest or criminal act committed by you or any of your partners whether acting alone or in collusion with other persons.

May asserts that there is no record evidence that any "loss" resulted from any dishonest or criminal act committed by May (or Doane while employed by May).

In a 1999 evaluation while he was employed by May, Doane received a "1," the lowest possible mark, in 4 out of 29 categories, including "Personal Integrity and Responsibility." Tigay worked with Doane on another project in 1999 and had given him a "1" on the line that states "[d]emonstrates critical facility to manage project."

Doane resigned from May and went to work for NIR. May contends that Doane resigned on June 10, 1999. In support, May attaches a July 21, 1999, letter from Christopher Christy, the

---

[4]The court notes that neither party ever discusses whether a claim was made on this policy/bond or whether any request for coverage was declined based on Doane's allegedly fraudulent conduct.

director of personnel at May, to Doane which states that "[w]e acknowledge and accept your resignation. Accordingly, your present Working Agreement is considered terminated effective on your last working date June 10, 1999." Exh. R. to May's Rule 56 statement of facts. NIR argues that Doane was not actually terminated until the date of the letter acknowledging his resignation, which was July 21, 1999, because he could not have returned to work prior to the July 21, 1999 letter. However, NIR cites only to the letter in support of its position and fails to provide any other record citation (or citation to legal authority) for its interpretation of the letter. Without any support for a contradictory position, the court will assume that Doane's termination date was June 10, 1999, as stated in the letter.

*Doane's Employment at NIR*

At his deposition, Price agreed with the complaint's allegation that May had represented to NIR that Doane was "skilled as a CPA, skilled in setting up accounting checks and balances to avoid defalcation, embezzlement and threat of company funds, and was an honest and responsible employee who could be trusted with the Plaintiff's accounts and was bonded up to $500,000 for the protection on NIR." While Price asserts that he was told that all NIR employees go through a background check in order to be bonded, the May employee whom Price asserts told him that, Wayne Dille, testified that he did not, as his normal procedure, discuss with clients whether May performed background checks on its employees. The May Field Manual states that "[t]he fact that all employees have qualified for such bond attest to the integrity of the Company's personnel." May also advertised to its customers that each employee was covered by a $500,000 bond.

As noted earlier, Price ultimately hired Doane, a May employee, as NIR's controller.

May asserts it was in May 1999 while NIR contends that Doane was still employed at May in May 1999.[5]  At the time that Doane proposed to Price that NIR hire Doane as its controller, Price knew that he was contractually prohibited from hiring a May employee pursuant to the terms of the Authorization for Management Service and Method of Payment Agreement.  The Agreement expressly states that NIR was prohibited from hiring a May employee for one year from the date of the Agreement.  Price testified that Doane showed him a written waiver that allowed him to hire Doane, but the parties do not indicate that this purported written waiver is part of the record.  Price also testified that Doane had what NIR has characterized as a "pretend telephone with May personnel in front of Price in order to further convince Price that May had released plaintiff from any prohibitions to hire Doane as its new controller."  NIR Additional Statement of Fact 53, Dkt. #186 at p. 17.  When asked what Doane said during this allegedly pretend telephone call, Price testified as follows:

> Basically, you know, it was a one–it was a one-sided conversation.  And basically said, you know, this is Bill Doane and, you know, Mr. Price is here.  You know, and I told them I'd call them over the phone to verify that you gave us–gave me permission to work for him.

NIR Exh. EE, Doane dep. at p. 149.

Prior to hiring Doane as an employee for NIR, Price did not speak with anyone at May regarding hiring Doane or follow-up with May as to whether he was actually authorized to accept employment at NIR.  Moreover, Doane did not report to May that NIR had hired him or that he had accepted the position.  May's project director for the NIR engagement, Vladimir Tigay, never

---

[5]It is unclear from the record when NIR actually "agreed" to hire Doane.  However, the record indicates that Doane worked on the NIR engagement as a May employee up to Wednesday, June 2, 1999.  *See* NIR Exh. CC.

told or recommended to anyone at NIR that it should hire Doane as its employee. NIR did not

conduct a background check on Doane before hiring him. Doane worked for NIR until

approximately September 2000.

Price testified that Doane opened up bank accounts and credit card accounts while he was

a May employee working at NIR that purportedly allowed him to later steal from NIR.[6] The first

"questionable accounting entry" by Doane during his employment at NIR which is identified in

NIR's expert report is dated July 23, 1999, after Doane left May and had started working at NIR.[7]

At his deposition, Tigay testified that based on the review of documents presented to him at the

deposition (which are not specifically identified), nothing indicated that Doane had done

anything improper while working for May during the NIR engagement.

*Doane's Prior Wrongdoing*

On August 25, 1998, according to records presented by NIR, Doane pled guilty in the 16th

Judicial Circuit Court of Jackson County, Missouri to "stealing" and received a suspended

---

[6] NIR's statement of fact number 58 states that Doane "almost immediately started looting" NIR by writing company checks to himself. NIR's first citation in support is to May's Exh. E, which is NIR's expert report of Vince Cummings. The report is several pages long and has numerous entries in very small print. NIR does not specify what page or entry actually supports its statement of fact number 58. As noted previously, the Seventh Circuit has repeatedly held that it is not this court's duty to hunt through the record searching for support for a party's argument. Thus, Exh. E will not be considered by the court in support of this statement of fact. Its second citation to the record is an exhibit containing copies of two checks made out to William Doane. However, there is no citation to any testimony that these checks were forged by Doane or otherwise not authorized by NIR. Thus, the checks provide no support for the statement of fact and also will not be considered.

[7] NIR does not set forth in its statement of facts the total amount of money that Doane allegedly stole from NIR. It only references two checks made out to Doane in the amounts of $3,000 and $12,000, which Doane testified were a signing bonus that had been authorized by Price. The signature on the checks appears to be that of Price and it is not clear if NIR is alleging that the signatures on these checks were forged by Doane.

imposition of sentence (SIS) and was placed on probation for two years. Doane testified that he had stolen money from a client and had admitted to the probation office that he "misused the funds of his clients for personal expenditures." He was arrested at the office of his previous employer and immediately fired. A March 3, 1999, case summary report from the Board of Probation and Parole from the Missouri Department of Corrections indicates that "[i]t should be noted that there is currently an outstanding misdemeanor warrant for Doane regarding passing a bad check in Cole County, Missouri. The date of that warrant pre-dates Doane's probation, and therefore, is not a violation."[8] Doane testified that he stopped attending meetings with his probation officer and stopped paying restitution in November 1998 after he was hired by May.

According to the website of the 16th Judicial Circuit Court of Jackson County, an SIS means that:

> the defendant was found guilty, but the Court chose not to give the defendant a sentence for the period of time he/she is on probation, as long as the defendant successfully completes the probation period. The court retained jurisdiction to impose any sentence within the full statutory range of punishment in case of revocation of the probation. The length of time noted on the written judgment refers to the length of the term of probation, not the length of a jail or prison sentence. When the defendant successfully completes the term of probation, the case becomes a closed record.

It further states:

> If a defendant successfully completes the term of probation, this is NOT considered to be a conviction for purposes other than subsequent criminal prosecutions. Once the defendant is discharged from probation, the record becomes a closed record; when a background check is done, it will not reveal a conviction on the SIS case.

May attaches as its Exhibit V an August 7, 2000, letter from a Christopher Reynolds to

---

[8]The court notes that this document has not been authenticated, thus it cannot be considered on summary judgment.

David Price which includes background check information regarding William Doane. This letter does not include any reference to a criminal conviction.

Doane testified in his deposition that he passed the bad check in "'99 or '98," but did not plead guilty until November 2000. Doane also testified as to certain federal and state tax liens that were imposed against him in 1994, 1996 and 1997 for failure to pay payroll taxes. According to Doane, it was his understanding that the liens had been released pursuant to a settlement agreement.

NIR's expert, Vince Cummings, opined in his expert report that Doane caused the demise of NIR and caused NIR to lose profits of $18.5 million.

NIR filed a seven-count complaint, alleging the following five counts against May: Breach of Contract (Count I); Fraudulent Misrepresentation (Count II); Negligent Misrepresentation (Count III); Breach of Fiduciary Duty (Count IV); Constructive Fraud (Count V). May seeks summary judgment as to all of NIR's counts as well as to its own counterclaim.

## III.     Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The existence of a factual dispute is not sufficient to defeat a summary

judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts.  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

## IV.    Analysis

A.    <u>Breach of Contract</u> (Count I)

In its complaint, NIR alleges that:

> May has failed to perform under and breached the Contract [i.e., Authorization for Management Services and Method of Payment] by failing to implement appropriate managerial accounting, inventory management, cost control and general business consulting services as required by the Contract.

May moves for summary judgment on this claim arguing first that it was not obligated to "implement" procedures; rather, it was only required to "provide recommendations of methods by which NIR could meet its desired objectives."

The Agreement that May allegedly breached provides little guidance as to what May's contractual obligations were.  Indeed, the only two paragraphs that could even be construed as referring to what tasks May was to perform read as follows:

> 1) Throughout the period of the engagement, George S. May International Company, a Delaware corporation (hereinafter called the "Company") will, by discussions, recommendations and progress reports, keep the client informed as to its progress.
>
> In order that there may be continual meeting of the minds between the client and the Company, and particularly, in order that the continuation of the services of the Company is at all times within client's control, acceptance or rejection of all, or any part, of matters covered in discussions, recommendations and progress reports shall be by client's signature to Progress Reports of the Company under "Examined, Accepted and Approved," specifically excluding by designation any statement not approved.
>
> 2) For the guidance of Management Service Development and progress, the Staff

will design an action program around each major objective sought. A major objective is attained through a precisely formulated phase or unit of Management Service termed a Project. Each engagement requires the adaptation of one or more projects, depending upon the number of major objectives. The Company Staff time requires on each assignment depends upon the content of each Project and the number. Authorized Projects may run concurrently or consecutively, depending upon mutual agreement.

The court notes that these paragraphs are completely devoid of any specificity or detail as to what May was supposed to do for NIR. So, to the extent that NIR asserts a breach of contract claim against May, it begins on weak ground. NIR asserts that May was required to engage in "implementation" and points out that the Agreement states that: (1) May is "attaining" major objectives; and (2) NIR must accept and approve matters and, according to NIR, if May was simply making recommendations and was not implementing anything, then NIR approval would not have been required. These arguments are nonstarters. NIR fails to explain or provide any support for its sweeping claim that the word "attain" means "implement" or that the requirement that NIR accept the work done by May means that May was required to "implement" its projects.

The simple fact is that NIR has not pointed to any evidence that May was required to "implement" anything. More importantly, even if the court were to agree that May was required to "implement" something, NIR wholly fails to identify what it was that May failed to implement. In an apparent recognition of this latter point, NIR refers to the MCAP and PECP programs developed by Tigay for NIR. As noted above, these programs are laid out in two different documents, one for the MCAP and one for PECP. *See* Exhs. K and L. Each document lays out the "projects" associated with each program, i.e., the specific tasks that May was to perform and the objective for each project. For instance, in the MCAP document, underneath the general project of Functional Organization, identified as number "1.0", sub-projects like

"Develop a Functional Organizational Structure for NIR and represent it in an Organizational Chart," numbered 1.1, are listed. The same structure is carried out in the remainder of the document with four general projects and 21 sub-projects listed. In the document related to the second program, PECP, May recommended three projects with a total of 21 sub-projects.

As noted by May, NIR fails to identify any of the 42 total sub-projects that May did not complete as a basis for its breach of contract suit. Apparently, in support of its allegation that May failed to "implement" the programs, NIR points to the language in the MCAP and PECP project documents that "[t]he above project is to be completely installed." Again, however, NIR fails to identify any part of the project that was not installed. Accordingly, to the extent that NIR's breach of contract claim is based on a purported "failure to implement," May's motion for summary judgment is granted.

However, NIR raises another basis for its breach of contract claim. Specifically, in its response, NIR asserts that May's argument "overlooks that May breached its express contractual promise in paragraph 6 of the Agreement that its staff members are bonded for $500,000, and where May failed to complete Doane's bond application or even send it in to the insurer, or verify the veracity of Doane's answers as required, then May's motion must be denied for the obvious breach by itself." Response at 6. While May's reply fails to address this issue, NIR does not point to any record evidence that the insurance application was not sent in or that Doane was not bonded. NIR's argument regarding the bond is thus speculative, and NIR has therefore failed to point to evidence showing the existence of a triable issue of fact. Moreover, NIR has failed to state how it was damaged by May's alleged failure to bond Doane. Accordingly, May is also granted summary judgment with respect to this aspect of NIR's breach of contract claim.

NIR also appears to be attempting to raise some kind of breach of implied warranty claim.[9]  As noted by May, May disclaimed any express or implied warranties in the Agreement, and NIR does not contend that these disclaimers are invalid.  In any event, as noted above, in the context of the supposed breach of implied warranty claim, NIR has not identified any aspects of the contract with which May failed to exercise reasonable care or failed to perform in a workmanlike manner.  Thus, to the extent that breach of implied warranty claim is properly before the court, summary judgment against NIR is granted.

   B.   Fraudulent and Negligent Misrepresentation (Counts II and III)

   In Count II of its complaint, NIR alleges that May made representations that it would perform the services called for by the Agreement and would use "appropriate, bonded, personnel" to do so.  Under Kansas law[10], "[a]ctionable fraud includes an untrue statement of fact, known to be untrue by the party making it, which is made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his or her injury and damage."  *Gerhardt v. Harris*, 934 P. 2d 976, 981 (Kan. 1997)(citation omitted).  Here, as detailed below, NIR's fraudulent misrepresentation count

_____

   [9]It is not even clear that this claim is even properly before the court.  NIR did not assert a separate breach of warranty claim and did not give notice in its amended complaint that it was seeking to assert a breach of implied warranty claim.  Nevertheless, the court will address the substantive argument related to this claim as May does not assert that the claim is not properly before the court.

   [10]The court notes as background that this case was initially filed in the District of Kansas in 2001.  However, in May 2002, the Kansas district court judge granted defendant's motion to transfer the case to the Northern District of Illinois based on a mandatory forum selection clause.  All of the relevant events took place in Kansas and May contends in its motion for summary judgment that Kansas law applies pursuant to Illinois' choice of law rules.  NIR does not object to this conclusion and the court therefore has applied Kansas law to the claims at issue.

must fail because May did not make any misrepresentations and, even if misrepresentations were made, NIR did not reasonably rely on them.

        1.     *May did not make any misrepresentations*

May first asserts that it did not make any misrepresentations while NIR contends that May made misrepresentations "about whether Doane was bonded, whether he was an appropriate staff executive, and whether he had a CPA." Response at 13. NIR fails to cite to the record in support of any of these statements of fact. "'Judges are not like pigs, hunting for truffles buried in' the record." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 n.1 (7th Cir. 2008)(citations omitted). It is not this court's job to decide which, if any, record citations support the arguments made by NIR. For this reason alone, NIR's argument fails.

Moreover, an unescorted perusal of NIR's statement of facts fails to reveal any record citation establishing that Doane was not bonded or that he was not a certified public accountant. NIR merely asserts that this is so, but mere assertions without specific evidentiary support fail to rebut May's position. As to whether Doane was an "appropriate" employee, this is not a statement of fact, and, as noted above, actionable fraud must be based on an untrue statement of fact.[11] As such, NIR has failed to demonstrate that May made an untrue statement of fact.

---

[11]While not expressly so stating in the argument section of its response, NIR appears to argue at points that May breached its duty (or the Agreement) by not conducting a background check on Doane. Even assuming that such duty or contractual obligation existed, May notes that for his conviction of stealing, Doane received a suspended imposition of sentence. According to the website of the court that imposed the sentence, this means that "the defendant was found guilty, but the Court chose not to give the defendant a sentence for the period of time he/she is on probation, as long as the defendant successfully completes the probation period." Further, if the individual satisfactorily completes the term of probation, it is not considered a conviction other than for subsequent criminal convictions. Thus, as May notes, even if it had conducted a background check, the conviction for stealing was not going to appear. Indeed, a background check that is included in the record, which was sent to Price, president of NIR, in August 2000, a

## 2. *Did NIR reasonably rely on the misrepresentations?*[12]

Nevertheless, even assuming that an untrue statement of fact was made, NIR's claim for fraudulent misrepresentation is doomed by the requirement that it show that it reasonably relied on the purported statements made by a May employee.[13] *DeBoer v. American Appraisal Associates, Inc.*, 502 F. Supp. 2d 1160, 1169 (D. Kan. 2007)("[U]nder Kansas law a plaintiff's reliance on a misrepresentation must be reasonable, justifiable, and detrimental")(citations omitted). The court agrees that NIR's claim ultimately fails because even assuming that May lied to NIR, NIR has not demonstrated: (1) that May made statements with the intent that NIR would rely on them to hire Doane as its controller or (2) that NIR justifiably relied on the representations.

Under Kansas law, "[a] claim for intentional misrepresentation requires a misrepresentation of fact for the purpose of inducing another to act in reliance upon the

---

[12]While May next asserts that any misrepresentations were not knowing or reckless and that it exercised reasonable care and competence in its communication with NIR, the court need not address those arguments as the reasonable reliance inquiry is determinative of the fraudulent misrepresentation claim.

year after NIR hired him, does not indicate that Doane had any criminal history. The court notes, however, that nothing in the record indicates that the background check included criminal history.

[13]May argues that even if it made misrepresentations, NIR could not have relied on them and suffered damages. In other words, May asserts that no causal connection exists between the misrepresentations and the damage claimed by NIR. Specifically, May asserts that NIR's hiring of Doane contrary to the terms of the Agreement constitutes an intervening cause between the services performed by May and whatever illegal actions Doane took while employed by NIR. Thus, May's argument goes, because it cannot be the cause of any damages, it is entitled to summary judgment on the fraudulent and negligent misrepresentation claims even if it did make a misrepresentation. Because the court disposes of the fraudulent misrepresentation claim on the reliance prong, the need not address May's argument regarding causation.

misrepresentation." *Katzenmeier v. Oppenlander*, 178 P.3d 66, 69-70 (Kan. Ct. App. 2008)(citations omitted).  Assuming that someone at May told Price that Doane was an honest and responsible employee and that a background check had been conducted on him, NIR has pointed to no evidence that May had any reason to believe that NIR would rely on this statement as a basis for hiring Doane.  In other words, there is no record evidence that May's purpose in making the comments was to induce NIR to hire Doane as its controller.  Indeed, Doane was May's employee and the Agreement expressly *prohibited* NIR from hiring Doane for at least one year from the date of the engagement.  When, despite this clause and without direct verification from May that he could hire Doane, Price decided to offer Doane the position, nothing prevented him from conducting his own background check.[14]

Thus, contrary to NIR's position, any reliance by NIR on statements regarding Doane's character as a basis for hiring him as its controller was unreasonable in light of the no-hire provision in the Agreement.[15]  Accordingly, because NIR cannot show that it reasonably relied on May's alleged statements regarding Doane's trustworthiness, May's motion for summary judgment on the fraudulent and negligent misrepresentation claims is granted.  *DeBoer,* 502 F.

---

[14]Price appears to have had a background check performed on Doane almost a year after he had hired him and that background check did not disclose Doane's plea of guilty to the prior stealing charge.  *See* Exh. V, August 7, 2000, letter from Christopher Reynolds to D. G. Price. The court notes, however, that the record does not reveal the scope of the background check.

[15]Although not raised by May, it appears that NIR's fraud claim is also properly dismissed under "the well established principle that to maintain a fraud claim under Kansas law, the basis of the claim must be different from the conduct upon which a breach of contract claim is based." *Capitol Business Solutions, LLC v. Konica Minolta Business Solutions USA, Inc.*, No. 08-2027-JWL, 2008 WL 2761307, at *4 (D. Kan. July 14, 2008)(citation omitted).  Here, it appears that NIR's fraudulent misrepresentation claim is based on the same conduct on which it is alleging a breach of contract–that all staff members are bonded for the protection of the client.

Supp. 2d at 1167 ("The elements of both fraudulent misrepresentation and negligent misrepresentation include, among other things, an untrue statement and the plaintiff's justifiable reliance on the truth of that statement.")(citations omitted).

C.     Breach of Fiduciary Duty (Count IV)

NIR has also alleged that May breached a fiduciary duty to NIR.[16]  Under Kansas law:

> A fiduciary relationship exists where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.  Whether a fiduciary relationship exists depends on the facts and circumstances of each individual case. The Kansas Supreme Court has refused for that reason to give an exact definition to fiduciary relationships.
>
> Generally, there are two types of fiduciary relationships: (1) those specifically created by contract or by formal legal proceedings and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. The determination of the existence of a fiduciary relationship in the second category is more difficult to determine.

*Linden Place, LLC v. Stanley Bank*, 167 P.3d 374 (Kan. Ct. App. 2007)(citations omitted).  NIR contends that a principal-agent relationship existed pursuant to contract that created a fiduciary relationship.  NIR also asserts that a fiduciary relationship was implied in law.

1.     *Contractual Fiduciary Duty*

May first argues that the Agreement did not create a fiduciary duty pursuant to a principal-agent relationship.  *Henderson v. Hassur*, 594 P.2d 650, 658 (Kan. 1979)("The

---

[16]In stating the elements of a breach of fiduciary duty claim, May cites to an unpublished order of the Kansas Supreme Court which is prefaced by a warning that: "The decision of the Court is referenced in the Pacific Reporter in a table captioned 'Supreme Court of Kansas Decisions Without Published Opinions.' By rule, unpublished opinions are deemed to be without value as precedent and shall not be cited as precedent by any court or in any brief or any other material presented to any court, except to support a claim of res judicata, collateral estoppel, or law of the case. Supreme Court Rule 7.04."

relationship existing between a principal and agent is a fiduciary one. . . .")(citation omitted).

NIR argues, without citation to authority, that the Agreement created a fiduciary relationship

because it "was for professional services where May was retained at great expense to provide

managerial services entirely for the benefit of NIR in a strictly confidential manner with access to

all of NIR's relevant confidential documents." Response at 9.[17] This argument, however, does

not point to any specific language in the Agreement expressly creating a principal-agent

relationship. Rather, NIR is actually relying on the facts surrounding the parties' relationship

(which includes the general terms of the contract) in order to meet its burden of establishing a

principal-agent relationship. Thus, contrary to its position that the Agreement expressly created a

principal-agent fiduciary duty, NIR appears to be arguing that a fiduciary relationship (principal-

agent or otherwise) was implied in law. This argument is addressed in the next section of this

order.

      2.     *Implied in Law Fiduciary Duty*

May also contends that no implied in law fiduciary relationship existed. As noted by the

Tenth Circuit Court of Appeals:

> Although . . . fiduciary relationships [implied in law] cannot be defined with
> precision, the Supreme Court of Kansas has prescribed "certain broad principles
> which should be considered in making the determination of whether a fiduciary
> relationship exists in any particular factual situation:

---

[17]At one point in this section of the briefing, NIR argues that the Agreement (also called
the "Management Service contract" by NIR) created a principal-agent relationship because
Doane conducted interviews of outsiders on behalf of NIR to assist in filling certain positions at
NIR, including that of controller. However, May's statement that it would "assist in interviewing
candidates for the position of NIR controller," is contained in the MCAP document, not the
Agreement. There has been no discussion by the parties as to the legal significance of the
program documents (i.e., are they contracts, particularly in light of the integration clause in the
Agreement?). The failure to raise or develop any such arguments means that they are waived.

A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

The court in *Denison* made clear that each of the general considerations listed above need not be present in every case in which a fiduciary relationship is alleged. However, the court emphasized that an overriding consideration in the law of fiduciary relationships was that "one may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." The court went on to state that "[t]his is particularly true when one ... is fully competent and able to protect his own interests."

*Rajala v. Allied Corp.*, 919 F.2d 610, 614 (10th Cir. 1990)(internal citations omitted). Moreover, the "conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law." *Id*. (citations omitted).

As noted by May, there is no evidence that it consciously assumed a fiduciary duty. NIR responds that May agreed to perform management services for NIR, and use its superior business knowledge to complete business programs for NIR's benefit with access to all of NIR's confidential financial information. While it is true that May's services were intended to benefit NIR, NIR fails to point to any specific competent evidence that May deliberately assumed the responsibilities of a fiduciary. *Rajala*, 919 F.2d at 623 ("Merely acting for one another's benefit will not give rise to fiduciary duties under Kansas law unless it is shown that the alleged fiduciary consciously assumed fiduciary responsibilities."). *See also Terra Venture, Inc. V. JDN Real Estate Overland Park, L.P.*, 443 F.3d 1240, 1245 (D. Kan. 2006)("An ordinary business relationship should not be construed as a fiduciary relationship, absent clear intent by the

parties."); *Pepsi-Cola Bottling Co. Of Pittsburg v. PepsiCo, Inc.*, 431 F.3d 1241, 1267-68 (10th Cir. 2005)(2005).

To the extent that NIR seeks to establish a fiduciary duty implied by law pursuant to a principal-agent relationship, the court notes that:

> Not all relationships in which one person provides services to another satisfy the definition of agency. It has been said that a relationship of agency always "contemplates three parties—the principal, the agent, and the third party with whom the agent is to deal."

Restatement (Third) on Agency §1.01 (2006), comment c., "elements of agency" (citation omitted). Here, the vast majority of the services that May was to provide to NIR did not involve third parties. NIR points to the fact that the MCAP document provided that NIR would "assist in interviewing candidates for the position of NIR controller," which involved third parties. But even assuming the evidence establishes that May was acting as NIR's agent with respect to interviewing candidates, NIR has not demonstrated that May somehow breached that specific duty (i.e., assisting in interviewing candidates for the position of NIR controller).

3.    *There was no breach of a fiduciary duty*

NIR contends that May breached its fiduciary duty to NIR by negligently hiring Doane and subsequently placing him as NIR's controller. However, even assuming that a fiduciary duty existed with respect to the services May provided, NIR has failed to show a breach of that duty. As already discussed, NIR has come forth with no evidence that May agreed to place one of its employees as NIR's controller. Indeed, the terms of the Agreement specifically contradict that assertion by prohibiting NIR from hiring a May employee for a year after the date of the engagement. Despite this express contractual prohibition, NIR decided to hire Doane anyway on

the basis of a letter and a one-sided phone call by Doane without conducting any due diligence of its own. NIR cannot shift responsibility for that decision onto May and claim that May breached an implied fiduciary duty running to NIR. *U.S. v. Lopeztegui*, 230 F.3d 1000, 1001 (7th Cir. 2000)("Were we giving awards for creativity, novelty, or perhaps even chutzpah, [NIR] would be a serious candidate to receive one.").

    D.   <u>Constructive Fraud</u> (Count V)

"Constructive fraud is a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty or purpose or intent to deceive is necessary." *Garrett v. Read*, 102 P.3d 436, 445 (Kan. 2004)(citation omitted). "Two additional elements also must be proved: '[T]here must be a confidential relationship [, and] the confidence reposed must be betrayed or a duty imposed by the relationship must be breached.'" *Id*. (citation omitted).

Under Kansas law, a confidential relationship is "any relationship of blood, business, friendship, or association in which one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over the first part." *Heck v. Archer*, 927 P.2d 495, 500 (Kan. 1996)(citation and internal quotation marks omitted). Courts will not presume the existence of a confidential relationship. *Kampschroeder v. Kampschroeder*, 887 P.2d 1152, 1156 (Kan. Ct. App. 1995).

According to NIR, the test for a confidential relationship is interchangeable with the test for a fiduciary relationship.[18] *Heck*, 927 P.2d at 500 (defining confidential and fiduciary

---

[18]In support of its position that a confidential relationship existed, NIR relies upon two unpublished cases, *Hack v. Novak*, 184 P.3d 286 (Kan. Ct. App. 2008) and *Adair v. Ward*, 777 P.2d 861 (Kan. Ct. App. 1989), which "are not precedential and are not favored for citation"

relationship in the same way).  Because the court has found no fiduciary relationship, it also finds

that no confidential relationship existed.   Moreover, as described above, the court has also found

that no breach of any duty occurred.  Thus, NIR's claim of constructive fraud fails and May is

granted summary judgment as to this claim.

     E.    <u>May's Counterclaim</u>

May filed a counterclaim alleging that NIR breached its contract to May when it hired

Doane in contravention of the Agreement under which NIR agreed not employ or engage the

services of any May employee for a period of one year after the date of the Agreement.

NIR asserts that May's counterclaim must fail for two reasons.  First, it asserts that May

first breached the Agreement when it failed to have Doane bonded, and "a party who commits

the first breach cannot maintain an action for a subsequent breach by the other party."  Response

at 15.  In taking this position, however, NIR necessarily must show that May breached the

contract by failing to have Doane bonded, which it has not done.  While arguing that Doane was

not bonded, NIR fails to point to any specific evidence in the record demonstrating that Doane

was not bonded.  Accordingly, this argument fails.

NIR also argues that equitable estoppel bars May's claim.  This is so because, according

to NIR's somewhat convoluted argument, it was May's job under MCAP Project 2.8 to help hire

an NIR controller, Price reasonably expected that May's project supervisor, Tigay, knew or

would learn that NIR had hired Doane, and yet May never objected.  In other words, NIR argues

that Price had every reason to believe that May knew that Doane had taken the job with NIR and

did not object; thus, NIR asserts that May is equitably estopped from claiming breach of contract.

_____

pursuant to Kansas Supreme Court Rule 7.04(f).

Under Kansas law:

> A party seeking to invoke equitable estoppel must show that the acts, representations, admissions, or silence of another party (when it had a duty to speak) induced the first party to believe certain facts existed. There must also be a showing the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. There can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction.

*Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 383, 855 P.2d 929 (1993)(internal citations omitted).[19]

NIR fails to point to any evidence in support of the elements of the equitable estoppel claim. First, NIR fails to point to any acts, representations, admissions or silence by May with respect to Doane's hiring by NIR. Price testified that he was aware that the Agreement prohibited him from hiring Doane. However, because Doane showed Price a purported written waiver from May and supposedly called someone at May to receive permission for Price to hire him (though Doane purportedly made this call in Price's office in front of Price, Price never asked to speak with the May representative, either at that time or ever), he thought he had permission to hire Doane. NIR has failed to point to any record evidence that anyone at May knew that Price had hired Doane. Moreover, none of these actions implicate May or support the proposition that May itself engaged in any misrepresentations, admissions, or silence as required to establish equitable estoppel. As such, NIR's attempt to invoke equitable estoppel fails.

NIR also asserts that "Doane committed numerous frauds to inform NIR that May had waived this contract provision, and May should be held responsible for such fraudulent acts of its

---

[19]The court notes that NIR does not bother to set forth the elements of equitable estoppel under Kansas law.

employees as a violation of its required good faith and fair dealing in the contract." Response at 15 (*citing Kansas Baptist Convention v. Mesa Operating Limited Partnership*, 864 P.2d 204 (Kan. 1993)). As the court understands it, NIR's argument appears to be that the May's obligation of good faith and fair dealing requires it take responsibility for Doane's purported misrepresentations. While the case cited by NIR discusses the concept of good faith and fair dealing, it does not provide any support for NIR's contention that May cannot recover for breach of contract based on Doane's actions.

Because NIR has failed to set forth any specific and competent evidence to rebut May's summary judgment motion on its breach of contract claim, the court grants May's motion regarding its counterclaim.

## V.      Conclusion

For the reasons stated above, May's motion for summary judgment [179-1] is granted. Status is already set for September 25, 2008, at which time the parties should be prepared to set a hearing date for the prove-up of damages on May's counterclaim as well as a trial date for the claims against defendant Doane.

**ENTER:**

**Date:** September 24, 2008

*Blanche M. Manning*
_____

**Blanche M. Manning**
**United States District Judge**